**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **Carolyn Masterson, on behalf of herself and others similarly situated,**<br><br>                                   **Plaintiff,**<br><br>**v.**<br><br>**Capital One Services, LLC ,**<br>**Capital One Financial Corporation, and**<br>**Capital One, National Association,**<br><br><br>                                   **Defendants.** | **CIVIL ACTION NO.**  3:21cv300 |

## <u>COMPLAINT</u>

Plaintiff Carolyn Masterson ("Masterson") ("Plaintiff"), on behalf of herself and all

others similarly situated, respectfully moves for judgment against Defendants Capital One

Services, LLC, Capital One Financial Corporation and Capital One, National Association,

(collectively "Capital One" or "Defendants"), as follows:

<u>Introduction</u>

1.      This is a claim for relief pursuant to the Age Discrimination in Employment Act

(ADEA) in Counts I and II, and pursuant to the Fair Labor Standards Act (FLSA) pursuant to

Count III.  Plaintiff contends that her termination, and those of similarly situated employees were

inappropriately and illegally occasioned because of age. Plaintiff further contends that she and

similarly situated Risk Managers of Capital One were unlawfully deprived overtime premium for

work performed in excess of 40 hours per week.

2.      Plaintiff brings Counts I and III as collective actions pursuant to 29 U.S.C. §

1

216(b) under both ADEA and FLSA.

Jurisdiction and Venue

3.      This Court has jurisdiction for Plaintiff's FLSA and ADEA claims pursuant to 29 U.S.C. § 216(b), 29 U.S.C. § 626(b), and under 29 U.S.C. § 626(c), in that the Plaintiff may bring this action in any appropriate United States District Court.

4.      Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

5.      Defendants are subject to personal jurisdiction in the Commonwealth of Virginia.

Parties

6.      Masterson is a resident of Virginia who was employed by Capital One until March 19, 2020.  Plaintiff was an "employee" as defined in the ADEA.

7.      Capital One Services, LLC is a foreign corporation, which has its principal office in Virginia.

8.      Capital One Financial Corporation is a foreign corporation, which has its principal office in Virginia.

9.      Capital One, National Association is a foreign corporation, which has its principal office in Virginia.

10.     On information and belief, the Defendants are related entities in the financial products and services industry. According to filings with the Virginia State Corporation Commission, the Defendants list their principal office as being located at 1680 Capital One Drive, McLean, Virginia 22102 and share the same registered agent.  Plaintiff is currently unable to determine the precise corporate structure and relationship between Defendants.  Defendants

are an "employer" as defined by the FLSA.

Factual Allegations

11.     Masterson was hired by Capital One in 2013 and worked continuously for Capital One until her termination in March of 2020.

12.     During the time frame relevant to this lawsuit, Masterson worked as a Principal Associate-Risk Specialist for Capital One.

13.     Capital One uses the terms "risk specialist" and "risk manager" interchangeably. As used herein, "Risk Manager" includes both terms.

14.     Masterson worked mainly from Capital One's West Creek office complex in Goochland County, Virginia.

15.     Masterson's duties as a Risk Manager supported the carrying out of already developed processes associated with anti-money laundering ("AML") and other regulatory compliance requirements.

16.     Masterson's primary duties involved interfacing with auditors and replying to their requests for information.  In gathering responsive information, Masterson was a go-between for the auditors and Capitol One's various lines of business (who possessed the information.)

17.     Masterson was similarly responsible for ensuring the data collected from the business units aligned with what was requested.

18.     Masterson did not perform auditing duties and was not part of the audit group, rather she performed supporting duties for the auditors and the audit group, including:

              a.     Responding to requests and directions from the auditors;

              b.     Acting as a primary point of contact for auditors;

              c.     Serving as a messenger or go-between for the auditors and Capital One's

various lines of business.

19.     Auditors requested information through Masterson. Masterson in turn requested such information from Capital One's various business units, then sent such information back to the auditors.

20.     Masterson had no authority to decide what information was requested nor did she have authority to create or influence the AML or other regulatory/compliance requirements set out by the auditors or Capital One's risk management leaders.

21.     Capital One has five categories for its performance evaluation ratings scale: Exceptional, Very Strong, Strong, Inconsistent, Action Required.

22.     Capital One informally refers to the five categories as five "buckets."

23.     As part of the evaluation process each year, Capital One employees are issued an overall rating which places them within one of the five "buckets."  This overall rating consists of two areas: "Results" (which are generally objective metrics) and "Competencies" (which consist of subjective criteria such as "communications," and "lives the values").

24.     During her employment with Capital One, Masterson regularly received overall ratings of "Strong" in her performance evaluations.

25.     Capital One claims to hire the best and brightest associates available. For example, Chief Information Officer Rob Alexander stated in a blog post on July 19, 2017 that Capital One has a "best people philosophy," which involves hiring the "best talent in the industry."

26.     During the relevant time period, Capital One implemented a policy that sought to increase Capital One's "involuntary attrition" rate of employees, that is, terminations based on alleged poor performance or job elimination.

27.    Capital One implemented its policy to increase involuntary attrition in order to eliminate older and longer-tenured employees and make room for the hiring of young, recent college graduates through its CRP program. Capital One is in sole possession of statistical data reflecting the increased rates of involuntary attrition, the ages of employees terminated involuntarily, and the ages of the newly-hired employees during the relevant time period.

28.    In order to carry out Capital One's new policy to increase "involuntary attrition" it changed or implemented other personnel policies, including:

   a.    Prohibiting employees rated "Inconsistent" from finding other roles within Capital One (the "No-Transfer" policy);

   b.    Changing from a "performance management" distribution that was a "guide" or "aspirational" distribution (previously as low as 5% in the bottom two "buckets"), to a mandatory forced distribution;

   c.    Changing the prior policy which only required a "coaching plan" or PIP for employees in the "Action Required" bucket, to now also requiring a coaching plan or PIP for all employees who are rated in the "Inconsistent" bucket.

29.    The No-Transfer policy that went into effect was that any employee rated "Inconsistent" was prohibited from transferring to another role within Capital One without special dispensation from a VP-level executive.  Individual discretion of managers to accept transfers of employees rated "Inconsistent" was prohibited. Previously employees rated "Inconsistent" were allowed and encouraged to find other roles within Capital One (based on its "best people philosophy"), and the hiring managers had wide discretion to approve, and routinely did approve, such transfers.

30.    The most significant change in Capital One policy was that it intentionally sought

5

to increase its rate of "involuntary" terminations.

31.     Capital One tracks percentages of "involuntary" terminations, also known within Capital One as "involuntary attrition."

32.     At Capital One, "involuntary attrition" refers generally to terminations that are "involuntary" to the employee, namely (1) performance-based terminations, and (2) job eliminations (known within Capital One as "restructuring").

33.     Upon information and belief, Capital One required its managers to involuntarily terminate a set percentage of its employees across all business units.

34.     The policy requirement to meet specific "involuntary attrition" targets was set by the highest executives within Capital One.

35.     "Performance Management" was the primary means by which this central policy of increasing "involuntary attrition" rates was implemented.

36.     At Capital One, the term "distribution" means the range of performance ratings set for each "bucket" of performance. Previously the "distribution" percentages set for each "bucket" was aspirational. During the relevant time period of this lawsuit, Capital One's "distribution" percentages were mandatory.

37.     This "Performance Management" policy of forcing managers to rank a fixed percentage of employees as poor performers was informally called "forced rankings" or "forced distribution" by Capital One employees.

38.     Under the guise of "Performance Management," the Executive Committee (EC) members, (the highest echelon of executive leadership at Capital One), determined the specific forced "distribution" percentages applicable to their lines of business. Managers within those lines of business had to meet the forced distribution resulting in a fixed percentage of employees

6

ending up in each of the performance "buckets" as pre-determined by the EC executive.

39.     Managers implemented the forced "distributions" in an annual process called "Cross Calibrations," which is part of Capital One's "Performance Management" process.

40.     The term "Cross Calibrations" is what Capital One calls the process by which final performance rankings are assigned. At the conclusion of Cross Calibrations, the managers must achieve the final forced "distribution" of assigned performance buckets as directed by the EC member for each line of business.

41.     Leading up to Cross Calibrations, supervisors assign a proposed "bucket" rating evaluation to their subordinate employees.

42.     Then, in the Cross Calibration meetings, managers group together two or more of the supervisor's subordinate employees to determine which of the employees will be ranked in what bucket, adhering to the "distribution" percentages pre-determined by the EC executive for their line of business.

43.     Employees who are being "calibrated" are not present in the cross calibrations.

44.     Employees are often "calibrated" within (and against) a group of other employees who have different supervisors, perform different duties, and have different objective metrics. But the end goal for Capital One is to have a fixed percentage of employees within the forced distribution range determined by the EC.

45.     It is common for managers in the Cross Calibration process to change the proposed "bucket" rating (assigned by the direct supervisor before the Cross Calibration process) to a lower bucket for the purpose of achieving the pre-determined forced distribution.

46.     It is also commonplace within the cross calibrations for older employees to be pushed down to a lower bucket than younger employees in order to meet the forced

"distribution."

47.     It is Capital One policy to exempt new hires from the "Cross Calibration" process.

48.     As a result, older employees ended up in the bottom two buckets more frequently than younger employees in the "Cross Calibration" process.

49.     Employees rated in one of the bottom two "buckets" were placed on "coaching plans" or "performance improvement plans" ("PIPs").

50.     Employees who, through "Performance Management" were forced into the bottom two buckets or placed on "coaching plans" and "PIPs," were the pool from which managers then would identify the ultimate target of "involuntary" terminations.

51.     In addition to "Performance Management," Capital One engaged in some restructuring in the form of job eliminations which also counted towards its targeted increase of its "involuntary attrition" rate.

52.     Elsewhere in the private sector, where an employer requires a set percentage of employees to be ranked as poor performers, this practice is commonly called "stack rankings." (*See, e.g.* Amazon to Drop Dreaded Stack-Ranking Performance Reviews, *Seattle Times*, Nov. 14, 2016; Microsoft Gets Rid of Stack-Ranking Review System, *Seattle Times*, Nov. 12, 2013).

53.     The problem with stack rankings is that employees who are objectively meeting all performance expectations are falsely rated as poor performers.

54.     Falsely giving good employees poor performance evaluations became Capital One's standard operating procedure under its "Performance Management" policy.

55.     The Requirement that a fixed percentage of employees be rated as poor performers, with a subset therein being terminated "involuntarily," led to objectively well-performing employees being issued poor performance evaluations, coaching plans, and PIPs, and

ultimately terminated.

56.     Although performance evaluations, coaching plans, PIPs, and terminations were issued directly to individual employees, it was all done as part of an overall policy implemented by Capital One to increase "involuntary attrition" rates across all lines of business.

57.     Through "involuntary attrition" of current employees, Capital One was making room for younger employees pursuant to a marketing, recruiting, and hiring campaign to attract recent college graduates.

58.     At the same time that Capital One was implementing stack rankings to increase the rate of "involuntary" terminations, it was engaging in a marketing, recruiting, and hiring campaign to attract recent college graduates to Capital One.

59.     "Our No. 1 principle is to attract really talented people," [Capital One VP of Human Resources Judy] Pahren says. "We know our success is dependent on talent." Recruiting younger workers like millennials, she adds, "is key to that strategy." *See* Virginia Business Magazine, The Rise of Millennials, November 2019.[1]

60.     Capital One's effort to hire younger workers came through its Campus Recruiting Program ("CRP"), which focused on hiring only recent college graduates.

61.     Within the past two years the CRP has been open only to college graduates in classes 2017 to 2021. Based on the general age of college graduates between the years of 2017 and 2021, Capital One has essentially set its hiring criteria to candidates in their early to mid-20s.

62.     Currently, Capital One's website makes clear that its "Full-Time Programs" in the CRP are limited only to college graduates from the classes of 2019 to 2021. (https://campus.capitalone.com, visited December 22, 2020).  The website directs anyone who

---

[1] Available at https://www.virginiabusiness.com/article/the-rise-of-the-millennials/ (last accessed Dec. 4, 2020).

graduated before 2019 to apply for jobs to Capital One's main site, separate from the CRP programs:



(https://campus.capitalone.com/full-time-programs/, visited December 22, 2020) (red circle added, link redirecting to https://www.capitalonecareers.com/search-jobs).

63.    In order to make room for the new CRP recruits in their early to mid-20's, Capital One intentionally increased its "involuntary attrition" rate, that is the rate at which employees are involuntarily terminated from their employment with Capital One.

64.    In order to increase its "involuntary attrition" rate and to make room for new hires in their early to mid-20's through the CRP program, Capital One required its managers to engage in the forced distribution, stack rankings, and issuance of "coaching plans" and "PIPs," under the guise of "performance management" as set forth above.

65.    Masterson was terminated by Capital One in March of 2020.

66.    Capital One's termination of Masterson did not arise out of individual circumstances.  It was a result of Capital One's mandate requiring managers to increase

"involuntary attrition."

67.     Until May of 2019, Masterson's mid-year and year end reviews consistently reflected a "strong" rating.

68.     In May of 2019, following her "strong" mid-year review, Masterson was assigned a new manager, Shannon Wickham.  Ms. Wickham is believed to be in her thirties. Masterson was also assigned a new "skip level" manager (her manager's manager), Shelly Doll.  Ms. Doll is believed to be in her forties.  The reassignments were part of an Applications Data Risk Management (ADRM) department restructuring.

69.     Masterson and Ms. Wickham were formerly peers, assigned to the same team. During that time, Masterson had observed Wickham make several remarks concerning her age and those of other older team members.  Ms. Wickham never asked Masterson about the ages of those team members who appeared to be younger.

70.     As the oldest member of the team, Masterson was repeatedly and consistently targeted by Ms. Wickham.  For example, despite Masterson's heretofore "strong" reviews, within days of becoming Masterson's manager, Ms. Wickham apropos of nothing, informed Masterson that her performance was not satisfactory.

71.     In her very first one on one meeting as Masterson's supervisor, Wickham went so far as to ask when Masterson planned to retire. Masterson demurred and responded to Wickham's obvious displeasure, that such an inquiry was both ageist and inappropriate and brought the matter to Human Resources.  However, on information and belief, Human Resources took no steps or action to address the matter.

72.     Due to Masterson's age and oppositional activity, Defendants' through and with Ms. Wickham, took a series of steps to marginalize and impair her ability to carry out the

functions of her job.  Masterson was intentionally excluded from key meetings and communications regarding projects on which she was assigned.  She was similarly excluded from updates regarding project and strategy status.  This meant that Masterson, the oldest team member often found herself as the only person in a meeting left unaware of business, department, or project changes.  Moreover, in the nine (9) months Ms. Wickham supervised Masterson, she did not assign Masterson a single new assignment.

73.     Ms. Wickham generally criticized Masterson often.  Masterson repeatedly asked Ms. Wickham for examples of what concerned her, but Ms. Wickham was unable to provide any.  In fact, Ms. Wickham's assessment of Masterson's performance as a Risk Manager was anathema to the view of the project's senior director, Van Daley, as well as Masterson's former senior manager, Jim Hill.

74.     In mid-July 2019, Masterson received a "Strong" mid-year rating, just as she had for all previous reviews.  Though Ms. Wickham was Masterson's manager at the time, the review was conducted by the former manager, Mr. Hill.  When Ms. Wickham spoke to Masterson about the review she wholly disregarded and discredited it and substituted her own jaundiced judgment in place of the reviewer, telling Masterson she was "not performing at a Principal Associate level and should not have gotten a 'Strong.'"

75.     Approximately two weeks after Masterson's "Strong" review, Ms. Wickham implemented several team changes.  Masterson's younger peers were all given additional responsibilities and a number of Masterson's responsibilities were removed.

76.     Despite the decrease in responsibilities, Masterson was still required to, and did, work more than 40 hours per week in order to complete all of the support duties expected of her.

77.     On August 1, 2019, Masterson met with Associate Relations to discuss Ms.

Wickham's discriminatory actions.  Masterson was told she was the problem and that she needed to "learn to accept feedback."

78.     After receiving no help from Associate Relations, on October 10, 2019, Masterson reached out to Ms. Wickham in writing directly expressing her concerns about her disparate treatment and opportunities as compared to her younger colleagues.  Ms. Wickham responded a week later by placing Masterson on a "Coaching Plan."

79.     After being placed on the Coaching Plan and having been frozen out of team meetings for the month of October, Masterson approached her new senior manager, Shelly Doll, about the situation.  Ms. Doll was uninterested in Masterson's concerns and instead advised her that she should "consider retiring."

80.     Masterson successfully completed the Coaching Plan and its deliverables.  After each Coaching meeting she would email Ms. Doll and Ms. Wickham a summary.  Unfortunately, there was no coaching in the meetings.  Instead, the meetings consisted of Masterson being falsely criticized for not completing deliverables prior to their explicit due date.  Masterson repeatedly asked what she could do better.  No response was provided.

81.     On January 7, 2020 the "Coaching Plan' closed out and Masterson was placed on a Performance Improvement Plan ("PIP").  For reasons never made clear to Masterson, the PIP's action items were never approved, which represented a significant divergence in the standard process.  As a result, Masterson was left with no clear documented goals and believed the PIP to be part of a continued plan to set her up to fail.

82.     Masterson attempted to complete the PIP, but was provided no guidance or feedback.  She continued to be excluded from team meetings and was isolated from her younger, more favored teammates.  Despite ignoring Masterson's requests for guidance and direction,

Wickham was comparatively very engaged when Masterson's younger peers requested assistance or coaching or guidance or simple feedback.

83. On February 5, 2020, the PIP ended, but Masterson was told no determination had been made yet. On February 9, 2020 she received her first ever "Inconsistent" rating on a mid-year or annual review.

84. On or about February 15, 2020, Masterson was called into a meeting with Ethics & Integrity. Masterson truthfully answered all questions posed and was told at the end of the meeting she was placed on administrative leave. Masterson was not told exactly what she had done wrong.

85. On or about March 18, 2020, Masterson was informed by Associate Relations that she was being terminated effective the next day for unsatisfactory performance.

86. On information and belief, the Coaching Plan, PIP, and alleged concerns of Ethics & Integrity were part of Defendant's ruse to falsely justify Masterson's termination as performance-related. The basis for her termination was pretextual. Moreover, the Coaching Plan, PIP, and termination were impermissibly motivated on the basis of age and retaliation against Masterson for her protected oppositional activity.

87. Masterson was replaced by an employee in her 20's.

88. Capital One's justification for Masterson's coaching plan and PIP were false.

89. Masterson was not a poor performer.

90. But for Masterson's age, she would not have been placed on a false Coaching Plan, a false PIP, or terminated.

91. The coaching plan and PIP were pretextual and false, and were issued in order to meet Capital One's "forced distribution" requirement in order to increase involuntary attrition.

14

92.     A similarly situated younger "Principal Associate" (believed to be in her mid-thirties) failed to meet an important deadline in 2019, but was not issued any Coaching Plan or PIP.

93.     In this case, the false coaching plan and PIP were used to justify Masterson's "calibration," forced ranking into the "inconsistent" bucket, and her termination.

94.     Capital One falsely categorized Masterson's termination as a "performance-based" termination, and offered her the "performance" severance.

95.     Masterson refused Capital One's severance offer.

96.     Upon information and belief, other older employees, who were also objectively strong performers, were also targeted and terminated by Capital One around the same time as Plaintiff.

97.     Capital One's process and policy of increasing involuntary attrition in the manner set forth herein, is both intended to result in terminations of older employees to be replaced by younger employees, and is a facially neutral policy that has a disparate impact on employees over age 40 across all lines of business at Capital One.

98.     Capital One implemented a mandatory increase in involuntary attrition across all lines of business. The EC members in charge of each line of business determined the precise goals/targets for involuntary attrition rates within their line of business. It was Capital One's standard business practice for all lines of business to use the policies and practices set forth herein to carry out the terminations needed to achieve the desired increase in involuntary attrition.

99.     Masterson brings this claim on behalf of herself and similarly situated former Capital One employees over age 40 terminated pursuant to Capital One's policy to increase its

15

involuntary attrition rates in order to make way for new younger hires through the CRP.

100.    Masterson's consent to be a party plaintiff is attached as Exhibit A.

### Count I – ADEA

101.    Capital One discriminated against Masterson because of her age, 63.

102.    Capital One's stated basis for Plaintiff's termination was pretextual.

103.    The allegation of poor performance was pretextual and false. Masterson had always been a strong performer until Ms. Wickham became her supervisor.  Ms. Wickham's immediate and nakedly unsupported determination that Masterson was a poor performer was driven by Defendant's discriminatory animus and a desire to retaliate against Masterson for her opposition to Ms. Wickham's inappropriate inquiry as to when Masterson was going to retire.

104.    The reasons given for placing Masterson on a Coaching Plan and PIP were pretextual and false.

105.    Throughout her Coaching Plan, Masterson repeatedly performed all deliverables and repeatedly sought feedback on what she could do better, but received no response.

106.    The reasons noted for Masterson's termination were pretextual.

107.    At the time of her termination in 2020, Masterson was the oldest member of her team.

108.    But for Masterson's age, she would not have been placed on a "coaching plan" nor selected for PIP or termination.

109.    Capital One disparately treated Plaintiff and other older associates, and treated younger employees more favorably, in the forced ranking and termination of older employees.

110.    Capital One's disparate treatment of Plaintiff and older employees was willful.

111.    Capital One intended its policies of involuntary attrition and increased hiring

16

through CRP to result in terminations of older employees and hiring of younger employees.

112.    Capital One's policies also had a disparate impact on older employees. Specifically, Capital One's policy to increase the rate and percentage of "involuntary attrition," which was implemented through a "performance management" policy which required forced or "stack" rankings to create a pool from which "involuntary" terminations were implemented, was the standard operating procedure at Capital One.  This policy had a disparate impact on Capital One employees over age 40.  The average age of Capital One employees was reduced as older employees were replaced, in "headcount," by newer hires, many of whom were in their early to mid-20's including CRP hires.

113.    Plaintiff was disparately impacted because of her age by Capital One's policies which resulted in her termination.

114.    Capital One implemented such discriminatory policy willfully, or showed reckless disregard for the rights of Capital One's employees over 40.

115.    Given Capital One's "best people philosophy," which involves hiring the "best talent in the industry," Capital One's policy of using "forced distributions" under the guise of "performance management" in order to increase "involuntary" terminations was implemented willfully with the intent to eliminate employees over 40 years of age while increasing hiring of younger employees. Alternatively, it was a neutral policy that disparately impacted employees over 40.

116.    Capital One's policy of increasing involuntary attrition in order to make way for hiring of young, recent college graduates through the CRP is a group termination plan that disparately impacted older employees across all lines of business at Capital one.

117.    Masterson is similarly situated to other employees over age 40 who were unfairly

terminated because of their age pursuant to the policies set forth herein.

118.    Masterson brings this action on behalf of herself and others similarly situated.

119.    Masterson and similarly situated older employees terminated pursuant to the discriminatory plan alleged herein suffered significant economic damages including loss of income, salary, fringe benefits, and other compensation in the past and continuing into the future.

120.    The termination policy alleged herein is an employment termination program under the Older Workers Benefits Protection Act (OWBPA) that affects two or more employees.

121.    Masterson and other similarly situated employees were offered severance agreements that did not comply with OWBPA.

122.    Upon the termination of Plaintiff and other affected employees, Capital One failed to comply with the OWBPA requirement that affected employees be given 45 days to consider the release, and that ages and job titles of affected employees be provided.

123.    Capital One did not provide 45 days, nor the statistical data of ages and job titles of other employees as required by OWBPA.

### Count II – ADEA Retaliation

124.    Masterson engaged in protected activity including reporting and complaining about ageist and discriminatory comments about Masterson's age and expected retirement.

125.    Because she engaged in protected activity, Capital one took materially adverse actions against her including issuing her a Coaching Plan, PIP, launching an "Ethics" inquiry, placing her on paid leave, and terminating her for alleged performance reasons.

126.     As a result of Capital One's retaliation, Masterson suffered significant economic damages including loss of income, salary, fringe benefits, and other compensation in the past and continuing into the future.

127.    As a result of Capital One's retaliation, Masterson suffered significant compensatory damages including pain, suffering, humiliation, stress, anxiety, and related emotional distress from the date of retaliation and continuing into the future.

### Count III – FLSA

128.    At all times relevant herein, Plaintiff was an "employee" of Capital One as that term is defined by 29 U.S.C. §203(e)(1).

129.    At all times relevant herein, Capital One was an "employer" of Plaintiff as that term is defined by 29 U.S.C. §203(d).

130.    Masterson did not supervise two or more full-time employees during the time she worked as a Risk Manager for Capital One.

131.    Masterson's primary duties were not directly related to the management or general business operations of Capital One and/or did not required her to exercise discretion or independent judgment over matters of significance.

132.    Other than periods of leave, Masterson regularly worked in excess of 40 hours per week.

133.    Masterson typically worked in excess of 50 or 60 hours per week including time worked at the office, working remotely, and working on weekends and vacations. Masterson's average workweek, excluding periods of leave, exceeded 50 hours per week.

134.    Masterson was classified by Capital One as an FLSA-exempt employee, and was not paid overtime compensation.

135.    At all relevant times herein Plaintiff was not exempt from the overtime pay requirements of the FLSA, and was entitled to receive overtime pay under the FLSA for all time worked beyond forty (40) hours in a workweek.

136.    Capital One failed to pay Plaintiff her overtime rate of pay for the time she worked beyond forty (40) hours in a workweek.

137.    At all times relevant herein, Capital One was aware of the overtime requirements of the FLSA.

138.    At all times relevant herein, Capital One knew or should have known that Plaintiff did not qualify for an exemption to the overtime pay requirements of the FLSA.

139.    Capital One's failure to pay overtime compensation to the Plaintiff was willful and not in good faith.

140.    Capital One misclassified Masterson and similarly situated Risk Managers as FLSA-exempt.

<u>Common Allegations</u>
<u>Risk Managers</u>

141.    Risk Managers are not required to exercise discretion or independent judgment involving matters of significance in carrying out their "Risk Management" duties.

142.    Plaintiff and other similarly situated Risk Managers did not perform as a primary duty managerial tasks over other employees, such as: interviewing, selecting, or training employees; setting employees' schedules or hours of work; directing employees' work; appraising employee productivity and efficiency; handling employee complaints and grievances; or disciplining employees.

143.    Plaintiff and other similarly situated Risk Managers did not perform work directly related to the management or general business operations of Capital One or its customers such as: banking, finance, accounting, information technology, setting of business policies, planning, negotiating, purchasing, promoting sales, business research, or other duties relating to running Capital One's business.

144.     Risk Managers duties involved acting as the go-between for other functions, i.e. auditing and traditional business units, for the purpose of compiling anti-money laundering data to be reviewed and assessed by persons other than Risk Managers.

145.     Plaintiff and other similarly situated Risk Managers did not perform work requiring advance knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.

146.     Plaintiff and other similarly situated Risk Managers:

     a.     did not have the authority to formulate, affect, interpret, or implement management policies or operating practices;

     b.     did not have authority to waive or deviate from established policies and procedures;

     c.     did not have authority to commit Defendants in matters that have significant financial impact;

     d.     did not have authority to negotiate and bind Defendants on significant matters; and

     e.     were not involved in determining Capital One's long- or short-term business objectives.

147.     Based on the nature of Plaintiffs' job duties, there is no FLSA exemption that applies to preclude her or other non-supervisory Risk Managers from being paid one and one-half times their regular rate of pay for all hours worked in excess of 40 per week.

148.     Capital One paid Plaintiff on a salary basis, and classified her and other Risk Managers as exempt from receiving overtime under the FLSA.

149.     Capital One did not require Plaintiff to keep precise track of her hours worked.

150.    Capital One does not have accurate timekeeping records of the exact hours worked by Plaintiff or other Risk Managers.

151.    Capital One issued Plaintiff and other Risk Managers iPhones and take-home laptops so that each could perform work for Capital One's benefit remotely and at all hours.

152.    Capital One did not pay Plaintiff any overtime premium for hours each worked over 40 per week.

153.    Capital One knew or should have known that Plaintiff and other Risk Managers were working overtime hours without being paid.

154.    Capital One received benefit of the work performed by Plaintiff.

155.    Capital One is in possession of records (such as log-in records, emails, and instant messaging systems) which should reflect that Plaintiff was performing work for Capital One in excess of 40 hours per week.

156.    Plaintiff sent and received work emails before and after the regular work day.

157.    Defendants willfully violated the FLSA by misclassifying Plaintiff and other Risk Managers as exempt under the FLSA in order to avoid paying overtime.

158.    At all relevant times Defendants intended to deprive Plaintiff of the overtime pay she was entitled to under the FLSA, or acted with reckless disregard for Plaintiff's rights under the FLSA.

<u>Collective Action Allegations</u>

159.    Plaintiff files this statutorily authorized collective action pursuant to 29 U.S.C. § 216(b) as representative Plaintiff on behalf of similarly situated Risk Managers.

160.    This claim on behalf of Risk Managers excludes any time during which a putative plaintiff supervised two or more full-time employees as part of their primary duty.  Some Risk

Managers may have been assigned to supervise two or more full-time employees, and any such putative plaintiffs are not intended to be included in this action during the time in which s/he supervised two or more full-time employees. This claim also excludes any Risk Managers who executed a release of claims approved by a court or the Department of Labor.

161.    Capital One employs, and has employed, multiple persons in the same job functions and/or positions that Plaintiff occupies, including the job functions and/or positions that make up the job of "Risk Manager" as set forth herein.

162.    Risk Managers perform, and have performed, functions which entitle them to payment of overtime compensation which they have not received.

163.    Risk Managers have been denied overtime wages in violation of the FLSA.

164.    Capital One compensated and continues to compensate Risk Managers on a uniform compensation basis which excludes any overtime premium.

165.    For at least the past three years, Capital One failed to keep records of the actual amount of hours Plaintiff and similarly situated Risk Managers have worked.

166.    On information and belief, Capital One's pay, administrative, recordkeeping, and supervisory operations are centrally managed as a single enterprise, and all or most Risk Managers at Capital One are subject to common, uniform time-keeping and payroll practices.

167.    Capital One has records of the identities and the job duties of its Risk Managers and/or similarly situated employees who perform similar duties but may have different job titles, and can easily identify the scope of similarly situated putative plaintiffs.

168.    The FLSA "collective" or "class" of similarly situated employees is composed of all present and former employees of Defendant who performed the same or similar job functions as Plaintiff and are, or were, subject to the same pay practices, and have been employed within

three (3) years of the date of the filing of this action, excluding any time period(s) during which any such employee supervised two or more full-time employees.

169.    Plaintiff asserts that Defendant's willful disregard of the overtime laws described herein entitles Plaintiff and similarly situated employees to the application of the three (3) year limitations period.

170.    The job duties of Plaintiff, and those similarly situated to Plaintiff, are not exempt from the coverage of the FLSA.

171.    At all relevant times, Plaintiff and other similarly situated employees have been entitled to the rights, protections, and benefits provided under the FLSA.

172.    Masterson's consent to be a party plaintiff is attached as <u>Exhibit A</u>.

## ADEA Relief Requested

Wherefore, Plaintiff requests the following Relief on behalf of herself and others similarly situated, against Defendants:

A.    An Order designating this lawsuit as a collective action and permitting the issuance of a notice pursuant to 29 U.S.C. § 216(b) to to similarly situated terminated employees over age 40 with instructions to permit them to assert ADEA claims including the options to file individual consents to sue pursuant to 29 U.S.C. § 216(b), or if their severance contains a class action waiver, to file an individual claim based on the OWBPA and ADEA violations by Capital One;

B.    An Order requiring Capital One to provide statistical data relating to employees and ages, involuntary attrition rates, headcount, performance management calibrations, forced rankings, involuntary terminations, new hires, and any other employment data relevant to Plaintiff's disparate impact claim;

C.      money damages suffered by Plaintiff and those similarly situated as a result of Capital One's age discrimination, including but not limited to lost pay, fringe benefits, and compensation in the past and continuing into the future;

D.      liquidated damages in an amount equal to all money damages suffered by Plaintiff as a result of Capital One's willful violations of the ADEA;

E.      Compensatory damages for retaliation in violation of ADEA;

F.      pre-judgment and post-judgment interest;

G.      reasonable attorney's fees and costs expended in the prosecution of this case;

H.      any and all further relief permissible by law.

## FLSA Relief Requested

Wherefore, Plaintiff requests the following Relief on behalf of herself and others similarly situated, against Defendants:

A.      An Order designating this lawsuit as a collective action and permitting the issuance of a notice pursuant to 29 U.S.C. § 216(b) to similarly situated current and former employees of Capital One with instructions to permit them to assert timely FLSA claims in this action by filing individual consents to sue pursuant to 29 U.S.C. § 216(b);

B.      money damages for all unpaid overtime compensation;

C.      liquidated damages in an amount equal to all unpaid overtime owed to plaintiff;

D.      pre-judgment and post-judgment interest;

E.      reasonable attorney's fees and costs expended in the prosecution of this case;

F.      any and all further relief permissible by law.

Plaintiff respectfully demands **TRIAL BY JURY** for all factual questions at issue in this case.

Respectfully submitted,
**Carolyn Masterson**
Plaintiff


By:_____/s/_____
Craig Juraj Curwood (VSB No. 43975)
Harris D. Butler, III (VSB No. 26483)
Zev Antell (VSB No. 74634)
Paul M. Falabella (VSB No. 81199)
Butler Curwood, PLC
140 Virginia Street, Ste. 302
Richmond, Virginia 23219
Tel:  804-648-4848
Fax: 804-237-0413
*Counsel for Plaintiff*

26